**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |
| | This Document Relates To: |
| | ***The City of Muscle Shoals, Ala., et al., v. 3M Company, Inc., et al.*, No. 2:24-cv-07479-RMG ("*Muscle Shoals*")** |
| | ***Colbert County, Ala., et al., v. 3M Company, Inc., et al.*, No. 2:24-cv-07480-RMG ("*Colbert County*")** |
| | Filed Pursuant to CMO 2A |

## PLAINTIFFS' RENEWED MOTION TO REMAND

COME NOW, The City of Muscle Shoals, Alabama, and the Muscle Shoals Utilities Board ("Muscle Shoals") and Colbert County, Alabama, and the Colbert County Water Department ("Colbert County"), and pursuant to this Court's Text Order (Dkt. No. 6790), submit the following Renewed Motion to Remand to State Court in light of the Fourth Circuit's recent ruling in *Maryland v. 3M Co.*, 130 F.4th 380 (4th Cir. 2025).

Before filing this motion, pursuant to CMO No. 2 and 2A, Plaintiffs conferred with Co-Lead Counsel for the PEC, who consented to the filing of this motion but have taken no position on the merits thereof.

## INTRODUCTION

There are tens of thousands of cases pending in this MDL. These two cases—*Colbert County* and *Muscle Shoals*—are unlike nearly all of them. That is because these cases are not about 3M's *manufacture* or *sale* of AFFF—or any PFAS-containing products for that matter. Rather, these cases are about 3M's *direct discharge* and *disposal* of PFAS-containing waste from its own manufacturing facility in violation of state permits and local ordinances. And unlike the thousands

1

of cases that have been in this MDL since their infancy, these two cases were litigated in state court for *two years*—with a hearing to set the cases for trial just weeks away—before being removed to federal court. These critical facts separating *Colbert County* and *Muscle Shoals* from nearly every other case in this MDL are why these two cases are due to be remanded. These reasons for remand do not depend on the legal effect of any AFFF disclaimer and are separate and distinct from the issues presented in the Fourth Circuit's recent decision in the *Maryland v. 3M* case.

First, 3M's basis for removal of these cases is not possible, much less plausible. 3M bases its removal on the unilateral assertion that it manufactured AFFF pursuant to "rigorous" and "reasonably precise" military specifications. (3M Notice of Removal ¶¶ 3, 35, *Muscle Shoals* Dkt. No. 1.)[1] But this Court has already made the factual finding that, "***as a matter of law*** . . . [3M's] AFFF MilSpec is ***not a reasonably precise specification*** under the first prong of *Boyle*." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. MDL 2:18-MN-2873-RMG, 2022 WL 4291357, at *8 (D.S.C. Sept. 16, 2022) (emphasis added). While this Court left open the question of whether 3M could establish the first prong of *Boyle* under the "continued use" doctrine, *see id.* at *8–12, there is no question that the "continued use" doctrine cannot apply in *these cases*. Because *Colbert County* and *Muscle Shoals* only concern 3M's direct discharge of PFOS and PFOA into the Tennessee River from its own manufacturing processes—the production of which ceased right as the federal government reached "ground zero" of its knowledge related to PFAS, *see id.* at *11—and not its sale of PFOS or PFOA to third parties, any later "continued use" by the government at military installations is simply irrelevant here. Based on this Court's prior factual

---

[1] For ease of reference, and because the facts and legal arguments largely overlap between the two cases, this Motion cites to removal and remand pleadings filed in the *Muscle Shoals* docket unless otherwise specified.

findings and the undisputed facts of these cases, 3M's government contractor defense is not merely implausible, but impossible.[2]

Second, even if 3M could generally assert the government contractor defense in cases relating to its *manufacture and sale* of PFAS-containing products (like in the *Maryland* case), it is not entitled to federal officer removal in cases based on its *disposal and discharge* of PFAS-containing waste (as is the case here). Put another way, even if 3M "acted under" the federal government in its manufacture of AFFF for the U.S. military, there is no "causal nexus" between its manufacture and sale of the product and 3M's waste disposal practices subject to state law permits and local ordinances. *See, e.g.*, *Carter v. Monsanto Co.*, 635 F. Supp. 2d 479, 497 (S.D.W. Va. 2009) (emphasis added) (holding that the case law is "clear that the government's control over certain aspects of *production* cannot provide a basis for federal officer removal for an action asserting claims solely based on the defendants' *waste disposal practices* because there is no causal nexus between the production activities conducted under government control and the disposal practices controlled by the defendant alone").

Third, even if 3M could establish federal officer removal in these cases, 3M simply waited too long to remove them. Based on 3M's own admissions, it *could have* removed these cases to federal court based on the information available to it (even if it did not *have to* under 28 U.S.C. § 1446(b)) for months, if not years, before doing so. But instead of promptly removing these cases, 3M opted to test the waters in state court for *two years*, even going so far as to argue to the Alabama Supreme Court that an Alabama state court had "exclusive jurisdiction" over the case. And it was only after litigating defensively in state court for two years (and just weeks from a hearing to set

---

[2] Notably, the *Maryland* court did not reach a decision on the plausibility of 3M's government contractor defense, and explicitly left it to this Court to decide "whether 3M plausibly alleged a colorable federal defense." *Maryland*, 130 F.4th at 393.

the cases for trial) that 3M finally decided it wanted to be in federal court instead of state court.[3] By "engaging in 'substantial defensive action' in state court before filing [its] notice of removal," 3M "demonstrate[ed] a 'clear and unequivocal' intent to remain in state court" and therefore "waived its right to removal." *See Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 186 (4th Cir. 2017). Therefore, regardless of whether 3M's removal was timely under 28 U.S.C. § 1446(b), 3M has waived its right to remove under Fourth Circuit case law.[4]

Colbert County and Muscle Shoals anticipate that there will be grounds for remand that apply to all of the "non-AFFF" cases pending in this MDL, and respectfully reserve their rights to rely upon such additional grounds for remand if application to these cases.[5] However, as set forth herein, there are simple grounds for remand that are unique to the undisputed facts of these two cases and apply regardless of the legal effect of Plaintiffs' disclaimers of AFFF. In short, 3M waited too long to remove, based on a defense that it cannot invoke.

## BACKGROUND

### I.    Factual Background

Colbert County and Muscle Shoals operate public water systems in North Alabama that rely on the Tennessee River as their sole source of drinking water. Just miles upstream from these

---

[3] Highlighting 3M's "wait and see" approach is the fact that, in the *seven months* preceding 3M's removal of these cases, 3M (in its own words) "was able to remove [nine] other Decatur-related lawsuits—and 3M did remove them—based on the same fact evidence 3M submitted [in *Colbert County* and *Muscle Shoals*] showing that it manufactured MilSpec AFFF at the Decatur facility." (*See* 3M Resp. to Pls.' Mots. to Remand, *Muscle Shoals* Dkt. No. 19, at 16.) Why 3M removed those nine (9) cases, while continuing to litigate *Colbert County* and *Muscle Shoals* in state court for seven (7) months before removing on the same set of facts is a question that 3M cannot answer.
[4] In *Maryland*, there was no dispute that 3M timely removed the case and did not waive its right to removal.
[5] In particular, Colbert County and Muscle Shoals preserve their argument that remand is warranted based upon their explicit disclaimer of AFFF in the event that the Fourth Circuit's holding in *Maryland v. 3M Co.*, No. 24-1218, 2025 WL 727831 (4th Cir. Mar. 7, 2025), is altered upon *en banc* review or other court action.

communities' raw water intakes, on the banks of the Tennessee River, looms 3M's manufacturing facility in Decatur, Alabama. It is at this plant that 3M manufactured the large majority of its fluorochemicals, including PFOS and PFOA. (*See* 3M Sulfonated Perfluorochemicals in the Environment Report, at 10 (Mar. 1, 2000), attached as **Exhibit A**.)

In some years, 3M discharged as many *10,000 pounds* of PFOS directly into the Tennessee River—upstream of Colbert County's and Muscle Shoals' drinking water intakes—through the plant's wastewater discharges. *Id.* at 21. 3M's plant emitted another *400,000 pounds* of PFOS into the surrounding environment each year from wastewater sludges that 3M dumped at local landfills and through air emissions. *Id.* Even today, millions of gallons of water containing PFOS and PFOA at concentrations as high as 114,000 parts per trillion ("ppt") and 47,200 ppt, respectively, discharge directly from 3M's plant into Plaintiffs' sole source of drinking water: the Tennessee River. (*See* 3M Discharge Monitoring Report, at 13–14 (Dec. 31, 2024), attached as **Exhibit B**.)

For over sixty (60) years, the Tennessee River and its tributaries have been 3M's personal dumping grounds for PFOS and PFOA-contaminated waste. It is because of 3M's direct discharges from its Decatur plant that the Tennessee River has been listed as an "impaired waterway" for PFOS contamination under Section 303(d) of the Clean Water Act for more than a decade. (*See* 2024 Alabama § 303(d) List, at 17 (April 1, 2024), attached as **Exhibit C**.) And it is because of 3M's direct discharges from its Decatur plant that the Tennessee River is, quite frankly, ground zero for PFOS contamination in North America.

## II.     Plaintiffs' Claims and Procedural Posture

Colbert County brought suit against 3M and other direct dischargers of PFAS-contaminated waste into the Tennessee River in August 2022. (*Colbert County* Dkt. No. 1-1.) Muscle Shoals filed its substantially similar lawsuit against the same Defendants in February 2023.

(*Muscle Shoals* Dkt. No. 1-1.) While both cases concern 3M's manufacturing facility in Decatur, Alabama, neither case is *about* 3M's manufacture or sale of PFAS-containing products to third parties. Rather, the Plaintiffs in both cases assert that 3M contaminated their drinking water through 3M's *direct discharges* of wastewater, stormwater, and groundwater containing PFAS in violation of state permits and local ordinances. *See id.* ¶¶ 9, 11, 19.

For more than two years, the parties vigorously litigated these claims in Alabama state court, *to wit*:

1. 3M filed Motions to Dismiss in both cases, arguing that a different Alabama state court had "*exclusive" subject-matter jurisdiction* over the case. (*See, e.g.*, Defs.' Supp. Mot. to Dismiss, *Muscle Shoals* Dkt. No. 10-2, at 3–4) (emphasis added);

2. After more than 1,000 pages of briefing and evidentiary materials were submitted to the Colbert County Circuit Court, 3M participated in a hearing on its pending motion to dismiss in the *Colbert County* case, where counsel for the defendants reiterated that the "Morgan County Circuit Court has *exclusive subject matter jurisdiction*." (Hrg. on Defs.' Mots. to Dismiss, *Muscle Shoals* Dkt. No. 51-2, at 6) (emphasis added);

3. After the trial court denied 3M's Motion to Dismiss, 3M argued all the way to the Alabama Supreme Court that the Morgan County Circuit Court "has *exclusive jurisdiction* over the County's claims." (Defs.' Pet. for Writ of Mandamus, *Muscle Shoals* Dkt. No. 10-3, at 20) (emphasis added);

4. After the Alabama Supreme Court denied the defendants' mandamus petition, 3M engaged in extensive state court discovery, including:

   a. Eleven (11) depositions, including six (6) depositions of defendants, three (3) depositions of government employees, and two (2) depositions of 3M consultants overseeing remediation of PFAS contamination in and around Decatur, Alabama;

   b. 3M's responses and objections to a combined 74 Interrogatories and 58 Requests for Production issued by the Plaintiffs;

   c. The production of more than 10 million pages of documents by 3M;

   d. 3M's issuance of a combined 72 Interrogatories, 130 Requests for Admission, and 170 Requests for Production to the Plaintiffs, to which Plaintiffs provided answers and objections;

    e.   The production of nearly 35,000 pages of documents by the Plaintiffs;

    f.   3M's objections to nine non-party subpoenas; and

    g.   The inspection of a former dump site for 3M's contaminated sludge, currently being remediated by 3M's consultants.

During the same time period that 3M was actively litigating these cases in state court, it removed nine (9) personal injury cases to federal court (and promptly transferred them to this MDL) on the very same factual basis that it asserts in *Colbert County* and *Muscle Shoals*—its manufacture of AFFF at its Decatur plant:

| 3M Notice of Removal – *Cowart v. 3M* (January 19, 2024) | 3M Notice of Removal – *Muscle Shoals v. 3M* (August 5, 2024) |
|---|---|
| "A product that 3M manufactured at its Decatur, Alabama facility was PFAS-containing AFFF that 3M manufactured in accordance with rigorous military specifications . . . To the extent that Plaintiffs allegedly were injured by ingesting drinking water contaminated with PFAS attributable to 3M's manufacture of PFAS-containing products at the Decatur, Alabama facility, their claims necessarily relate at least in part to MilSpec AFFF." (*Muscle Shoals* Dkt. No. 4-1, at 3.) | "[O]ne PFAS-containing product that 3M manufactured at its Decatur, Alabama facility was aqueous film-forming foams ("AFFF"), which 3M manufactured in accordance with rigorous military specifications . . . To the extent that Plaintiff's water supply allegedly has been contaminated with PFAS attributable to 3M's manufacture of PFAS-containing products at the Decatur, Alabama facility, Plaintiffs' claims relate at least in part to MilSpec AFFF." (*Muscle Shoals* Dkt. No. 1, ¶ 3.) |

Yet, it was not until nearly seven months later, and just weeks before a hearing to set the cases for trial, that 3M filed its Notice of Removal in *Colbert County* and *Muscle Shoals*. (*See* Order Setting Hrg. on Pls.' Mot. for Special Trial Setting, *Muscle Shoals* Dkt. No. 10-6.) And less than a month before it removed this case to federal court, 3M and its co-defendants informed the Circuit Court of Colbert County that they estimated *Muscle Shoals* would "be ready for trial during the second half of 2025." (Status Report, at 4 (July 8, 2024), attached as **Exhibit D**.)

Upon removal of these actions to the Northern District of Alabama—two years and one-and-a-half years after they were filed—3M sought transfer to this MDL and argued repeatedly and

vigorously that, "without question," the best court to hear Plaintiffs' remand arguments is *this Court*. (*See, e.g.*, 3M Mot. to Stay, *Muscle Shoals* Dkt. No. 17.) **While Plaintiffs' remand motions were fully briefed and argued before Judge Liles C. Burke in the United States District Court for the Northern District of Alabama, no ruling was issued prior to the JPML's transfer of these actions to this MDL in December 2024.** (*See* Transfer Order, *Muscle Shoals* Dkt. No. 46.)

## LEGAL STANDARD

3M bears "the burden of establishing [federal officer] jurisdiction." *See W. Virginia State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 297 (4th Cir. 2022). To meet this burden, 3M must show: "(1) that it acted under a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted official authority." *See Anne Arundel Cnty., Maryland v. BP P.L.C.*, 94 F.4th 343, 347–48 (4th Cir. 2024).

The "federal defense" offered by 3M—the government contractor defense—has its own three-part test: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *4 (quoting *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512–13 (1988)). 3M must show that its asserted federal defense is "plausible." *See Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021).

While the Fourth Circuit reviews a "decision granting a motion to remand for lack of jurisdiction under the federal officer removal statute" *de novo*, it reviews the "factual finding[s]"

of the district court, including whether "a party has waived its right to removal," for "clear error." *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 186 (4th Cir. 2017).

## ARGUMENT

**I.  Based Upon This Court's Prior Factual Findings and the Undisputed Facts of These Cases, 3M's Removal is Based on a Defense it Cannot Raise.**

*Colbert County* and *Muscle Shoals* arise out of the direct discharge of PFOS and PFOA into the Tennessee River from manufacturing and related facilities in and around Decatur, Alabama.[6] Plaintiffs make no allegations of any releases of AFFF from military sources. Nevertheless, 3M removed *Colbert County* and *Muscle Shoals* to federal court on the basis that 3M manufactured AFFF "in accordance with rigorous military specifications" at its Decatur plant. (*See* 3M Notice of Removal ¶ 3, *Muscle Shoals* Dkt. No. 1.)

However, that basis for removal—that 3M manufactured AFFF "in accordance with rigorous military specifications"—is simply false. As this Court is aware, it ruled over two years ago "***as a matter of law*** that the AFFF MilSpec is ***not*** a reasonably precise specification under the first prong of *Boyle*." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. MDL 2:18-MN-2873-RMG, 2022 WL 4291357, at *8 (D.S.C. Sept. 16, 2022) (emphasis added).

3M's removal pleadings even go so far as to make factual representations that are directly at odds with this Court's prior findings:

| 3M's Factual Misrepresentations - 2024 | This Court's Factual Findings - 2022 |
|---|---|
| "Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere 'rubber stamping.' It created (and has updated) detailed specifications . . . ***Those specifications are 'reasonably precise,' including in requiring the use of PFAS***." (3M | "[T]he Court finds ***as a matter of law*** that the ***AFFF MilSpec is not a reasonably precise specification*** . . . ." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *8 (emphasis added). |

---

[6] Colbert County and Muscle Shoals also bring claims against Daikin, Toray, and BFI. It is undisputed that these defendants did not manufacture AFFF pursuant to military specifications.

| | |
|---|---|
| Notice of Removal ¶ 35, *Muscle Shoals* Dkt. No. 1) (emphasis added). | |
| "3M's use of **PFAS in MilSpec AFFF was required** by military specifications." *Id.* ¶ 39. | "The MilSpec . . . **plainly does not require** PFOA, PFOS or any other C8-based chemistry." *Id.* at *7. |
| "Plaintiffs are seeking to use state tort law to attack **design choices dictated by the military**." *Id.* | "The Court finds that the **MilSpec did not specify the use of a particular formula** or the use of C8 chemistry." *Id.* at *6. |

Since the law of the case forecloses any argument that the AFFF MilSpec was "reasonably precise" under the first prong of *Boyle*,[7] the only way that 3M could satisfy *Boyle*—and therefore remove *any* PFAS case to federal court on the basis of a government contractor defense—is if "the government continued to use [AFFF containing PFOS] after acquiring **full knowledge** of its defects and risks." *See id.* at *4 (emphasis added).

This Court recognized that questions of fact could arise in the application of the "continued use" doctrine. *See id.* at *12 (noting "material factual disputes concerning whether 3M's delay for decades in disclosing its internal studies on the health and environmental effects of PFOS and related compounds retarded the government's knowledge and understanding of the danger PFOS posed to human health and the environment and resulted in a significant delay in the government's discontinuance of the use of 3M's AFFF"). But there are no possible questions of fact in *these cases*. It is not just implausible, but *impossible* for the "continued use" doctrine to apply in these cases based solely on (1) this Court's prior factual findings on summary judgment, and (2) the undisputed facts of these two cases. *Cf. Arlington Cnty.*, 996 F.3d at 254 (adopting "plausibility" standard for "colorable federal defense" element of federal officer removal).

---

[7] *See, e.g.*, CMO 3, ¶ 2, MDL Dkt. No. 72 ("[A]ll subsequent pretrial orders . . . shall be binding on all parties and their counsel in all cases currently pending, or subsequently transferred to, removed to, or pending in the MDL proceedings and shall govern each case in the MDL proceedings unless this Order explicitly states that it relates only to specific cases.").

Here, 3M admits that Plaintiffs' claims arise out of 3M's direct discharge of PFOS and PFOA into the Tennessee River from 3M's own manufacturing processes in Decatur, Alabama—not from any discharges from military sources. (*See* 3M Notice of Removal ¶ 7, *Muscle Shoals* Dkt. No. 1 (internal citations omitted) ("The Complaint specifically alleges that 3M manufactured PFOS and PFOA at its Decatur facility, and that PFAS-containing discharges from 3M's Decatur facility purportedly have polluted downstream portions of the Tennessee River.").) 3M also admits—and this Court acknowledged in its summary judgment order—that 3M began to phase out the manufacture of PFOS, PFOA, and AFFF generally in 2000. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *11 (citing Dkt. No. 1969-21)). And 3M fully "stopped production" of its foam fluorosurfactants "in the fall of 2001." (*See* Status Report on Environmental Concerns Related to Aqueous Film Forming Foam (AFFF), *Muscle Shoals* Dkt. No. 51-1, at 6.)[8]

In other words, any PFOS and PFOA continuing to discharge from 3M's Decatur plant into the Plaintiffs' drinking water had to have been manufactured prior to 2001. *See id.* So any "continued use" of AFFF at military installations after this point is simply irrelevant to these cases.

Moreover, this Court found that the same year 3M decided to discontinue the manufacture of PFOS and PFOA in Decatur—2000—was "essentially ground zero" for the EPA's investigation "into the health and environmental effects of PFOS and PFOA."[9] *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *11. Indeed, this Court found that the military's

---

[8] 3M even admits that it "has not made or used any PFOS or PFOA at Decatur for decades. ***All PFOA and PFOS releases about which the Plaintiffs complain are not from current operations, but from legacy operations***." (3M Resp. to Pls.' Mots. to Remand, p.21 n.5, *Muscle Shoals* Dkt. No. 19) (emphasis added).

[9] This Court found that, "[w]hen 3M announced in 2000 that it was phasing out its AFFF products, the company stated that its research showed 'the use of these products does not pose a risk to people.'" *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *10.

lead AFFF qualifier "did not learn *until* 2000 that PFOS was the fluorosurfactant used in 3M's AFFF." *Id.* at *7. Based upon this Court's prior factual findings regarding "the *profound lack of knowledge* of the government and general scientific community about the properties and risks of PFOS, PFOA and related C8 products prior to 3M's belated disclosures in the 1998-2000 period," the federal government could not, by definition, have had "*full knowledge*" necessary to trigger the "continued use" doctrine prior to 2000. *Id.* at *10 (emphasis added).

Yet, this is not to say that it is in any way plausible that the federal government could have immediately obtained "full knowledge" in 2000. As this Court has already found, 3M withheld "voluminous internal studies and its privately held conclusion that [PFOS] is 'insidiously toxic," and its "belated disclosure of more than 1,200 studies triggered, ***for the first time***, focused investigation at the EPA into the health and environmental effects of PFOS and PFOA ***beginning approximately in the year 2000***." *Id.* at *10–11 (emphasis added). Since that time, there have been "remarkable challenges that have been experienced in attempting to determine the long term health and environmental consequences of these previously unknown chemical compounds." *Id.* at *10.

Further, as this Court has recognized, it was not until 2006, a full *six years* after 3M's announcement, that the EPA ultimately fined 3M under the Toxic Substances Control Act for withholding "valuable, previously unreported information that will help the scientific community to better understand the presence of toxic substances in the environment." *Id.* at *9 (quoting Dkt. No. 2409-41, at 2). This Court found that the same year, "officials at the DoD's program for emerging chemicals of environmental concern (the 'EC Program') added PFOS to its Watch List, and in 2007 and 2008 EC Program officials commissioned impact assessment reports identifying and assessing the risks of PFAS-containing AFFF." *Id.* at *11 (citing Dkt. No. 1971-9, at 004).

Based solely on this Court's prior factual findings and these cases' undisputed facts, there is a fatal causal disconnect between Plaintiffs' claims and 3M's purported government contractor defense. Any long-chain PFAS (PFOS and PFOA) that is continuing to discharge from 3M's Decatur plant into the Plaintiffs' drinking water had to have been manufactured prior to 2001. (*See Muscle Shoals* Dkt. No. 51-1, at 6.) This was the same time that 3M was ceasing sales of AFFF to the government, and the government was just beginning to learn about the dangers of PFOS. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *11. Indeed, this was just as the military was learning that PFOS was even *in* 3M's AFFF. *Id.* at *7 (citing Dkt. No. 2063-36, at 89:15-24) (noting that NRL's lead AFFF qualifier "did not learn *until 2000* that PFOS was the fluorosurfactant used in 3M's AFFF."). This was also years *before* the EPA completed its review of 3M's belated disclosures and issued a $1.5 million fine for 3M's late disclosures. *Id.* at *9 (citing Dkt. No. 2409-41, at 2) (discussing EPA's $1.5 million fine of 3M for "violations of federal disclosure laws"). And even since this Court's 2022 summary judgment order on 3M's government contractor defense, the EPA has *continued* to develop its understanding about the environmental and human health concerns associated with PFOS and PFOA, including the announcement and finalization of Maximum Contaminant Levels (MCLs) for PFOS and PFOA in drinking water and the recognition of PFOS and PFOA as "hazardous substances" under CERCLA in 2024.

Critically, since these cases arise out of the direct discharge of PFOS and PFOA from 3M's own manufacturing processes—which were ceased right as the federal government reached "ground zero" of its knowledge related to PFAS—then any later "continued use" by the government at military installations is simply irrelevant to these cases. Therefore, based on the undisputed facts of these cases and this Court's prior factual findings on summary judgment, it is

not possible (much less plausible) that 3M can establish a federal government contractor defense in these cases. As a result, 3M cannot avail itself of federal jurisdiction under the Federal Officer Removal statute.

**II.    3M Cannot Establish a "Causal Nexus" Between its *Manufacture* of AFFF for the Federal Government and its *Disposal* of PFAS-Contaminated Waste in Violation of State Permits, Local Sewer-Use Ordinances, and State Common Law.**

Even if 3M could plausibly establish a government contractor defense under *Boyle*, it cannot establish a "causal nexus" between its manufacture of AFFF for the military and its own improper disposal of PFAS-contaminated waste. As explained above, the *Colbert County* and *Muscle Shoals* cases are not about 3M's manufacture or sale of PFAS-containing products—AFFF or otherwise. Rather, these cases are about 3M's direct discharge and disposal of PFAS-contaminated wastewater, stormwater, groundwater, and solid wastes into the Tennessee River and surrounding environment upstream of Plaintiffs' drinking water intakes. (*See, e.g.*, *Muscle Shoals* Dkt. No. 1-1, ¶¶ 9, 11, 19.)

This is a critical distinction, because even if 3M did **manufacture** AFFF pursuant to "reasonably precise" military specifications—a premise that flies in the face of this Court's prior factual findings "as a matter of law," *see In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *8—it did not **dispose** of PFAS-contaminated waste pursuant to any federal specifications. To the contrary, 3M's discharge and disposal of wastewater, stormwater, groundwater, and solid waste—the whole basis of Plaintiffs' claims in these cases—is regulated at the state and local government level.

Because of the causal disconnect between 3M's theory of removal (manufacturing of PFAS-containing AFFF) and Plaintiffs' actual claims in these cases (direct discharge and disposal of PFAS-contaminated waste), 3M cannot establish the necessary elements of federal officer

14

removal. Courts in this circuit—and many others—have faced nearly identical arguments and found that, for purposes of federal officer removal, there can be no "causal nexus" between a defendant's *manufacture* of a product in accordance with military and a plaintiff's claim of improper *disposal* of that product:

> The above cases make clear that the government's control over certain aspects of *production* cannot provide a basis for federal officer removal for an action asserting claims solely based on the defendants' *waste disposal practices* because there is no causal nexus between the production activities conducted under government control and the disposal practices controlled by the defendant alone. Therefore, the defendants in this matter cannot establish a basis for federal officer removal unless the defendants disposed of the 2, 4, 5–T waste under the direct and detailed control of the federal government or in furtherance of a specific request by a federal officer.

*Carter v. Monsanto Co.*, 635 F. Supp. 2d 479, 497 (S.D.W. Va. 2009) (emphasis added) (collecting cases).

The *Carter* case is particularly significant because the court in that case found that "the defendants were acting under federal direction when it produced 2, 4, 5–T" for the U.S. government for incorporation into Agent Orange. *Id.* at 494. However, the *Carter* court held that, "even absent the federal government's demand for 2, 4, 5–T, the defendants were producing 2, 4, 5–T and disposing of its waste in some manner. *They were not required to dump 2, 4, 5–T waste into the Manila Creek dump site because of the government's demand for Agent Orange.*" *Id.* at 495 (emphasis added). Nor is the *Carter* case an outlier. Federal courts have almost uniformly found that federal officer removal is not warranted based on a defendant's *manufacture* of a product pursuant to government specifications where the plaintiff's claims concern only the improper *disposal* or *discharge* of that product.[10]

---

[10] *See Rucker v. Monsanto Co.*, No. 23-CV-00868-SPM, 2023 WL 3494716, at *2 (S.D. Ill. May 17, 2023) (remanding case where "specifications provided were for the *manufacture and production* of Agent Orange" and "Removing Defendants failed to show any government requirement that chemicals from Agent Orange be *disposed of* in the way they were"); *Agee v.*

Recent rulings by the Fourth Circuit are in full step with this line of case law. In *Anne Arundel Cnty., Maryland v. BP P.L.C.*, 94 F.4th 343 (4th Cir. 2024) and *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022), the Fourth Circuit took up several oil and gas companies' attempts at federal officer removal. In both cases, local governments sued a number of oil and gas companies "alleging they misrepresented and concealed information about their fossil fuel products in violation of state tort and consumer protection laws." *Anne Arundel*, 94 F.4th at 346; *see also Baltimore*, 31 F.4th at 195. Those companies "sought—over and over and over—to remove the cases to federal court" based on the theory that they produced fossil fuels

---

*Monsanto Co.*, No. 3:09-CV-1336, 2010 WL 3835647, at *8 (S.D.W. Va. Sept. 29, 2010) (finding "no causal nexus . . . between the federal government's control of *manufacturing* and the actions underlying the plaintiff's Complaint," where plaintiff's claims "focus solely on injuries caused by the defendants' *disposal* practices"); *Brown v. Cerro Flow Prods., Inc.*, No. CIV 09-582-GPM, 2010 WL 55905, at *7 (S.D. Ill. Jan. 4, 2010) (granting motion to remand where removing Defendants failed to "show that federal officers dictated the manner in which the removing Defendants disposed of chemical wastes or compelled them to dispose of those wastes improperly"); *Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1052–53 (S.D. Ill. 2009) ("Plaintiffs do not assert that the Monsanto Defendants produced a flawed product. Rather, they assert that the Monsanto Defendants produced, stored and disposed of their products in a shoddy manner that resulted in leaks and spills of hazardous substances. . . . Accordingly, the Monsanto Defendants do not present a colorable government contractor defense."); *New Jersey Dep't of Env't Prot. v. Dixo Co., Inc.*, No. CIV.A. 06-1041 (SRC), 2006 WL 2716092, at *3–4 (D.N.J. Sept. 22, 2006) (finding that defendant "*manufactured* radiological and chemical products for use by, and pursuant to contracts with, the United States government and its agencies," but federal officer removal was not warranted because defendant "failed to present evidence that the government directed and controlled any aspect of Stepan's *disposal* of hazardous substances or the associated discharges"); *New Jersey Dep't of Env't Prot. v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398, 404–05 (D.N.J. 2005) (emphasis added) (noting "the distinction between governmental control over *manufacture and production* versus *disposal*" in the context of federal officer removal and ordering remand where defendant failed to offer any evidence that "the federal government exercised control over the *disposal* of hazardous substances"); *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268, 1273 (C.D. Cal. 1998) (agreeing with plaintiffs that federal officer removal was not warranted because "lawsuit [wa]s premised on [defendant's] *disposal* of TCE, not its *use* of TCE"); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 970 (D. Ariz. 1992) (emphasis added) (finding no federal officer jurisdiction where "government officials were undoubtedly most interested in the *production* of war materials, [but] the record before this Court does not demonstrate the government's necessary control over the method of *waste disposal*").

"under the direction of federal officers." *Anne Arundel*, 94 F.4th at 346, 348. However, the Fourth Circuit noted in both cases that the plaintiff's claims "do not challenge the companies' *production and supply* of fossil fuels," but instead attack the companies' improper "*concealment or misrepresentation* of information about fossil fuel products." *Id.* at 349 (emphasis added); *see also Baltimore*, 31 F.4th at 233–34. And the companies made no showing that "the federal government required them to market or describe their products in a certain way." *Anne Arundel*, 94 F.4th at 350. As a result, there was no "causal nexus" between what the plaintiffs were suing over (concealment/misrepresentation of fossil fuels) and what the defendants allegedly did for the federal government (production/supply of fossil fuels), and so remand to state court was proper. *See generally Id.* at 349–50; *Baltimore*, 31 F.4th at 233–34.

This case is no different. Like *Anne Arundel* and *Baltimore*, Colbert County and Muscle Shoals "do not challenge [3M's] production and supply" of PFAS, AFFF, MilSpec AFFF, or any other product. *See Anne Arundel*, 94 F.4th at 349. Rather, like *Carter*, Plaintiffs' "claims [are] solely based on [3M's] waste disposal practices," *i.e.*, 3M's direct discharges of PFAS-contaminated waste into the Tennessee River upstream of Plaintiffs' drinking water intakes for decades in violation of its state-issued permits, local sewer use ordinances, and state common law. *See Carter*, 635 F. Supp. 2d at 497. And just like in *Carter*, 3M cannot show that the U.S. military exercised any level of control over 3M's waste disposal practices at 3M's Decatur facility. Like *Carter*, "even absent the federal government's demand for [AFFF]," 3M was "producing [PFOS and PFOA] and disposing of its waste in some manner. They were not required to dump [PFAS] waste into the [Tennessee River] because of the government's demand for [AFFF]." *See id.* at 495.

3M accuses Colbert County and Muscle Shoals of "attempting to use state tort law to attack design choices dictated by the military." (3M Notice of Removal ¶ 39, *Muscle Shoals* Dkt. No. 1.)

But that's just not what these cases are about. 3M could have manufactured and supplied as much AFFF as it wanted to the military, and Colbert County and Muscle Shoals would not have drinking water contaminated by 3M's PFAS—*if only 3M had disposed of its waste properly*. But 3M did not dispose of its waste properly. Instead, 3M knowingly discharged literal tons of PFAS-contaminated wastewater directly and indirectly into the Tennessee River upstream of Plaintiffs' drinking water intakes with full knowledge that conventional treatment methods would not be capable of removing the chemicals. The U.S. military did not control that. 3M did. And because 3M cannot establish a "causal nexus" between its manufacture of AFFF for the federal government and its improper disposal of PFAS-contaminated waste, its federal officer removal argument fails.

## III.    3M Waived its Right to Remove Through "Substantial Defensive Action" in State Court.

Even if 3M could assert a government contractor defense in these cases in light of this Court's prior factual findings, and even if 3M could establish a "causal nexus" between its *manufacture* of AFFF for the government and Plaintiffs' claims concerning improper *disposal* of PFAS-contaminated waste, 3M still simply waited too long to remove these cases.

The Fourth Circuit has held that a defendant may waive its right to remove under the Federal Officer Removal statute "by demonstrating a 'clear and unequivocal' intent to remain in state court." *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 186 (4th Cir. 2017); *see also City of Martinsville, Virginia v. Purdue Pharma, L.P.*, No. 4:24-CV-00002, 2024 WL 4218847, at *11 (W.D. Va. Sept. 16, 2024) (quoting *Wolfe v. Wal-Mart Corp.*, 133 F. Supp. 2d 889, 893 (N.D.W. Va. 2001) (finding waiver of right to federal officer removal and noting that, "where a defendant has notice of the right to remove but continues to litigate in state court, prior to filing a notice of removal, the defendant will be considered to have waived its right to

remove.").[11] Waiver of a right to remove may be demonstrated by a defendant "engaging in 'substantial defensive action' in state court before filing a notice of removal." *Northrop*, 865 F.3d at 186. A district court's determination of whether a defendant waived its right to remove is a factual finding that can only be reversed based on "clear error." *Id.* (citing *Grubb v. Donegal Mut. Ins. Co.*, 935 F.2d 57, 59 (4th Cir. 1991)).

In *Northrop*, the Fourth Circuit found that, "[b]y actively engaging in defensive litigation in the state court for seven months before filing its removal notice," including by "engag[ing] in extensive discovery by serving and responding to multiple sets of interrogatories, requesting and producing documents, filing motions to compel . . . and deposing numerous witnesses," the defendant waived its right to remove under the Federal Officer Removal statute. *Id.* at 188. As other courts in this circuit have noted, "[t]he most obvious example of when a finding of waiver is appropriate is where a defendant removes a case to federal court after receiving an unfavorable determination on the merits of the case in state court." *Rafael Rodriguez v. Alvarez*, No. 8:19-CV-01552-PWG, 2019 WL 2367061, at *3 (D. Md. June 5, 2019).

Importantly, the question of whether a defendant waived its right to removal is separate and distinct from the question of whether the defendant's removal was timely under 28 U.S.C. § 1446(b)(1). *See Northrop*, 865 F.3d at 188 (finding that defendant's notice of removal "was both untimely *and* waived"). While timeliness under Section 1446(b) asks whether the defendant was

---

[11] Courts in this circuit have also found waiver of right to remove outside the context of federal officer removal. *See, e.g.*, *Redman v. Javitch Block, LLC*, No. 21-2236, 2022 WL 17716772, at *2 (4th Cir. Dec. 15, 2022) (finding waiver of removal jurisdiction where, "[i]nstead of proceeding straight to federal court, [the defendant] decided to avail itself of state court"); *Stehney v. Ferguson*, No. CV 6:16-3955-TMC, 2017 WL 2982114, at *5 (D.S.C. July 13, 2017) ("The state court docket demonstrates that the case has an extensive history, with Defendants filing answers and counterclaims, numerous motions, and participating in multiple hearings, thus waiving any possible right of removal.")

*required* to remove within 30 days (either by initial pleading or an "other paper"), the waiver doctrine asks whether the defendant *could have* removed the case but instead chose to engage in substantial defensive litigation in state court.

Here, 3M all but agrees that it *could have* removed these cases under 28 U.S.C. § 1442 from the outset: more than two years ago for *Colbert County* and a year-and-a-half ago for *Muscle Shoals*. (*See, e.g.*, Resp. in Opp. to Pls.' Mots. to Remand, p.23, *Muscle Shoals* Dkt. No. 19 ("Plaintiffs' disclaimer is insufficient to moot 3M's federal government contractor defense.") Rather, 3M argues that it did not *have to* remove these cases within 30 days of the filing of the complaint under 28 U.S.C. § 1446(b). *Id.* at 14. ("3M was not required to remove these actions any earlier than it did").[12] But this is a distinction without a difference. Because 3M admittedly *could have* removed these cases years ago—even if the 30-day removal clock had not yet started— but 3M instead opted to engage in substantial defensive litigation in state court, 3M has waived its right to removal. *See Northrop*, 865 F.3d at 188.

---

[12] That 3M *could have* removed these cases years before doing so is made clear by the fact that 3M *did* in fact remove nine (9) cases arising out of PFAS discharges from 3M's Decatur plant— cases which are, in 3M's own words, "materially identical" to *Colbert County* and *Muscle Shoals*." (*See* 3M Notice of Potential Tag Along, *Muscle Shoals* Dkt. No. 27-1.) 3M's response is that it "did not *have* to remove" those cases either, but 3M makes the astonishing admission that, "[r]egardless of the complaint's allegations, **3M was *able* to remove the other Decatur-related lawsuits—and 3M did remove them—based on the same fact evidence 3M submitted here showing that it manufactured MilSpec AFFF at the Decatur facility**." (3M Resp. in Opp. to Pls.' Mots. to Remand, *Muscle Shoals* Dkt. No. 19, at 16) (emphasis added). With these admissions, 3M makes Plaintiffs' arguments for them: if 3M was "able to remove" those "materially identical" cases "based on the same fact evidence" that 3M submitted in *Colbert County* and *Muscle Shoals* "showing that it manufactured MilSpec AFFF at the Decatur facility," then 3M cannot dispute that it was also able to remove *Colbert County* and *Muscle Shoals* all along. *See id.* 3M's decision to sit on that information for seven (7) months before finally deciding to remove *Colbert County* and *Muscle Shoals* is the epitome of waiver.

Despite the fact that 3M's theory of removal was available to it all along, 3M took substantial defensive action in state court over the course of two years before it finally decided to remove these cases, including:

1. 3M filed Motions to Dismiss in both cases, arguing that a different Alabama state court had "*exclusive" subject-matter jurisdiction* over the case. (*See, e.g.*, Defs.' Supp. Mot. to Dismiss, *Muscle Shoals* Dkt. No. 10-2, at 3–4) (emphasis added);

2. After more than 1,000 pages of briefing and evidentiary materials were submitted to the Colbert County Circuit Court, 3M participated in a hearing on its pending motion to dismiss in the *Colbert County* case. During this hearing, counsel for the defendants reiterated that the "Morgan County Circuit Court has *exclusive subject matter jurisdiction*." (Hrg. on Defs.' Mots. to Dismiss, *Muscle Shoals* Dkt. No. 51-2, at 6) (emphasis added);

3. After the Colbert County Circuit Court denied 3M's Motion to Dismiss, 3M sought a petition for writ of mandamus from the Alabama Supreme Court. There, 3M argued to the state's highest court that "the Morgan County Circuit Court has *exclusive jurisdiction* over the County's claims." (Defs.' Pet. for Writ of Mandamus, *Muscle Shoals* Dkt. No. 10-3, at 20) (emphasis added).

Even after it began removing "materially identical" cases to federal court "based on the same fact evidence" submitted in these cases (*see Muscle Shoals* Dkt. No. 19, at 16; Dkt. No. 27-1), 3M continued to engage in extensive state court discovery, including:

1. 3M's active participation in eleven (11) depositions, including six (6) depositions of co-defendants, three (3) depositions of government employees, and two (2) depositions of 3M consultants overseeing remediation of PFAS contamination in and around Decatur, Alabama;

2. 3M's responses and objections to a combined 74 Interrogatories and 58 Requests for Production issued by the Plaintiffs;

3. 3M's production of more than 10 million pages of documents;

4. 3M's issuance of a combined 72 Interrogatories, 130 Requests for Admission, and 170 Requests for Production to the Plaintiffs, to which Plaintiffs provided answers and objections;

5. The production of nearly 35,000 pages of documents by the Plaintiffs;

6. 3M's objections to nine non-party subpoenas; and

7. 3M's participation in the inspection of a former dump site for 3M's contaminated sludge, currently being remediated by 3M's consultants.

In fact, by the time 3M finally decided to remove these cases, they had progressed so far that 3M and its co-defendants informed the Circuit Court of Colbert County that *Muscle Shoals* could "be ready for trial during the second half of 2025." (Ex. D, at 4.) And 3M's Notice of Removal was filed just four days after the Circuit Court of Colbert County scheduled a hearing on Plaintiffs' Motion for Special Trial Setting. (*See* Order Setting Hearing on Plaintiffs' Motion for Special Trial Setting, *Muscle Shoals* Dkt. No. 10-6.)

As in *Northrop*, 3M waived its right to federal officer removal "[b]y actively engaging in defensive litigation in the state court." *See Northrop*, 865 F.3d at 186. In fact, 3M's choice to litigate defensively in state court far exceeds the facts of *Northrop*. There, the defendant "engaged in extensive discovery by serving and responding to multiple sets of interrogatories, requesting and producing documents, filing motions to compel . . . and deposing numerous witnesses." *Id.* at 188. Here, 3M served and responded to 146 interrogatories, 228 requests for production, and 130 requests for admission; produced more than 10 million pages of documents; and was involved in eleven (11) depositions. Yet, whereas the defendant in *Northrop* litigated in state court "for seven months before filing its removal notice," 3M litigated defensively in state court for two years in *Colbert County* and a year-and-a-half in *Muscle Shoals*. *See Northrop*, 865 F.3d at 186.

Moreover, 3M "demonstrate[ed] a 'clear and unequivocal' intent to remain in state court"—the hallmark of waiver—when it argued to both the Colbert County Circuit Court and the Alabama Supreme Court that a different Alabama state court had "*exclusive jurisdiction*" over the case. *Cf. Northrop*, 865 F.3d at 188 (finding waiver where defendant "sought multiple, substantive rulings from the state court . . . before filing the notice of removal").

22

Simply put, 3M wanted to be in state court until it didn't, and it is not a coincidence that 3M's Notice of Removal was filed just four days after the Circuit Court of Colbert County scheduled a hearing on Plaintiffs' Motion for Special Trial Setting. (*See* Order Setting Hearing on Plaintiffs' Motion for Special Trial Setting, Muscle Shoals Dkt. No. 10-6.) The Fourth Circuit has held that this type of "wait-and-see" approach is exactly what the waiver doctrine protects against. *Northrop*, 865 F.3d 188 (quoting *Estate of Krasnow v. Texaco, Inc.*, 773 F.Supp. 806, 809 (E.D. Va. 1991)) ("[A] defendant must not be allowed to test the waters in state court . . . and, finding the temperature not to its liking, beat a swift retreat to federal court. Such behavior falls within the very definition of forum-shopping and is antithetical to federal-state court comity."). 3M simply waited too long to see how things would play out in state court before deciding to play its removal card. Under Fourth Circuit precedent, this constitutes waiver of any right to remove under the federal officer removal statute. *See id.*

## CONCLUSION

Based on this Court's prior factual findings, the undisputed fact that these cases are about direct discharges by 3M rather than manufacture and sale to third parties, and the delay by 3M to timely remove these cases, Muscle Shoals and Colbert County respectfully submit that their cases are due to be remanded to the Circuit Court of Colbert County, Alabama.

Respectfully submitted this 4th day of April 2025.

*/s/ Jeff Friedman*
Jeff Friedman (FRI018)
jfriedman@friedman-lawyers.com
Lee Patterson (PAT060)
lpatterson@friedman-lawyers.com
Jay Friedman (FRI049)
jayfriedman@friedman-lawyers.com
Ethan Wright (WRI082)
ewright@friedman-lawyers.com
***Attorneys for Plaintiffs***

**OF COUNSEL:**
FRIEDMAN, DAZZIO & ZULANAS, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
Tel: 205-278-7000
Fax: 205-278-7001

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, a copy of the foregoing was electronically filed using

the CM/ECF system, which will send electronic notice of such filing to all counsel of record.

_/s/ Jeff Friedman_
OF COUNSEL